UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHERYL CHAPMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:06-cv-2211-B |
| | § | |
| THE DALLAS MORNING NEWS, L.P, et al | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM ORDER

In this action, Plaintiff Cheryl Chapman alleges age and gender discrimination against Defendants The Dallas Morning News ("TDMN"), Belo Corporation ("Belo") and Belo Management Services ("BMS") (collectively "Defendants"). Chapman brings her age and gender discrimination claims under the Age Discrimination in Employment Act ("ADEA") and Title VII. Pending before the Court is Defendants' Motion for Summary Judgment (doc. 29). Finding that Chapman has failed to carry her burden of proof at the summary judgment stage, Defendants' Motion is GRANTED.

## I. BACKGROUND

### A. Factual Background

Chapman was born on July 8, 1946. She has a bachelor's degree in English and a bachelor's in fine arts. She began her career in journalism in 1969. Prior to joining TDMN, she worked in various capacities at different periodicals. On March 13, 1993, Chapman was hired as a part-time employee at TDMN. Chapman was 49-years old. In 1995, Chapman became a senior overnight editor, in May 1996, a full-time copy editor and, in June 1998, the Books Editor at the Lifestyles

Desk. Bob Compton supervised Chapman until 1998, and Sue Smith supervised her until 2000. After Smith was promoted, Lisa Kresl became the Deputy Managing Editor of the Lifestyles Section and Chapman's supervisor. Kresl was born on August 3, 1963. Chapman and Kresl had a good, professional working relationship. Chapman Dep. 42-44, Defs. App. 14-15. No one in TDMN management ever made any comments to Chapman about her age or gender. Chapman Dep. 44, Defs. App. 15.

According to Chapman, her Books Editor position involved "intense physical labor" where "[h]undreds of books entered the department each week and have to be unpacked, filed and shelved." Pl. Resp. 4. The TDMN Books Section also received voluminous email, letters and phone calls. In 1998, Chapman had a part-time books office clerk who handled the general clerical duties but that clerk was terminated for job performance.

1.     *Chapman's 2003 Performance Appraisals*

During the course of her employment at TDMN, Chapman would be given performance appraisals. On occasion, Chapman would complete self-performance appraisals. The 2003 appraisal and self-appraisal are pertinent here.

In her August 22, 2003 self-appraisal, Chapman graded herself with "F's" in five of eight areas. Defs. App. 73-77. Chapman also wrote: (1) "[t]here is no day that does not end in failure"; (2) "I do not see any area of performance that I execute as well as it should be handled"; and (3) "I cannot seem to locate the avenues of improvement that I need to and must take." *Id.* at 75. In order to improve her performance, Chapman opined that "my performance would improve immeasurely if I could get more than 5 hours of sleep a night." *Id.* at 76. Chapman admits that this self-appraisal was "truthful and honest." Chapman Dep. 76, Pl. App. 39.

In December 2003, Kresl gave Chapman her annual performance appraisal that was critical of Chapman's job performance. Kresl graded Chapman overall as "meets" or "satisfactory" but noted that, in five areas, Chapman "needs improvement" or was "unsatisfactory." Defs. App. 67-70. For example, Kresl thought Chapman needed improvement in her business judgment:

> [Cheryl] has worked very hard, long hours to try to do [all administrative and clerical work]. That's not the best strategy. Cheryl must use her judgment to make choices on how best to use her time. She has seemed reluctant to let go of some tasks or do them differently. She and Lisa have been meeting to strategize and to agree on what tasks are ok to let go of and streamline. Cheryl works long hours. She must make some difficult choices about what to let go on the job so she can focus her efforts on where she will have the most impact – and more importantly, so she doesn't burn out.

Defs. App. 67. Kresl and Chapman discussed the evaluation "[p]oint by point." Chapman Dep. 57, Defs. App. 22. Kresl criticized Chapman for concentrating on administrative and clerical duties such as invoicing, sending tear sheets and copies of reviews to freelance writers. Kresl explained, at deposition, that she was concerned over Chapman's focus on reviewers instead of readers: "the most vital issue is reporting for the reader, making decisions about coverage and editing Jerome [Weeks], not serving the needs of the reviewers by sending them tear sheets ... ." Kresl Dep. 102, Defs. App. 108. Thus, Kresl offered Chapman suggestions on how to improve her job performance, including turning over invoicing duties to a clerk and identifying editors on the copy desk to develop as fill-in help. Chapman was further advised by Kresl that if she did not reorganize her employment priorities she would be placed on a written performance improvement plan.[1] Chapman understood that being placed on a performance improvement plan was akin to almost being terminated:

---

[1] "A performance improvement plan is a written agreement between the employee and TDMN setting forth goals the employee must successfully achieve to remain employed by TDMN. Employees are placed on a performance improvement plan when they have demonstrated performance deficiencies that have been addressed but not corrected." Kresl Aff. ¶ 5, Defs. App. 181.

a plan for the Dallas Morning News is when somebody is absolutely not doing their jobs and it is determined that this person cannot – is some incompetent who must essentially be taken to the woodshed and given a list of things to do and the times to do them. It is one step on the road to being dismissed. It's the initial step.

Chapman Dep. 43, Pl. App. 19.

After her 2003 review, Chapman changed her voicemail to notify writers and publicists that she would most likely not return their calls. However, she continued to perform other administrative and clerical duties. For example, Chapman continued to send tear sheets to reviewers "[b]ecause the reviewers were freelancers, and they counted on the tear sheets to get other freelance work for their own careers." *Id.* at 65, 81, Defs. App. 26. 37. Chapman also continued to do the invoicing paperwork even after the clerk took over the invoicing function. She also never identified copy desk editors for potential fill-in assistance.

    2.    *TDMN Reduction in Force (October 2004)*

Roughly during Chapman's tenure as Books Editor, TDMN experienced a decrease in newspaper revenues. In 2003, TDMN revenues were flat, and, in 2004, TDMN's revenues dropped 3.6% while operating costs and expenses increased. Accordingly, TDMN opted for a reduction in force ("RIF") that would affect approximately 126 positions. TDMN Publisher Jim Moroney advised employees that the TIF would take place in September-October 2004. In relevant part, the Lifestyles Desk was instructed to reduce its workforce down to 13-15 positions. Copy, Arts and Features were deemed "large." Kresl Dep. 16, Pl. App. 121. Thus, Kresl along with Department Heads Lois Reed (Copy Desk), Tom Huang (Features) and Rick Holter (Arts) met to reduce, consolidate and eliminate positions for the RIF. TDMN

Human Resources provided three methods (along with forms) for reducing the headcount. Kresl's group collectively decided to consolidate seven Assistant Arts Editor positions and two Arts Department head positions into eight "Assistant Editor" positions. Chapman's Book Editor position was consolidated with an Assistant Editor position to form the Assistant Editor-Books position.

To target the employee to be laid-off, the group ranked the nine assistant editors against each other. *See* Defs. App. 127. Leslie Snyder, Anne Bothwell and Tracy Brown, all female employees, were ranked first, third and fourth respectively. Charles Ealy, a male employee approximately 50 years old at that time, was ranked fifth. Ealy had a college degree and masters degree in humanities with a focus on literature and completed course work towards his Ph.D. in literature. Holter considered Ealy "a nationally renowned scholar on [a prominent southern writer]" with a "deep background in books." Holter Dep. 44, Defs. App. 144. Mike Maza, who is the same age as Chapman, was ranked sixth. Larry Bleiberg, the Travel Editor, was ranked second-to-last. Chapman was ranked last. Both Chapman and Bleiberg reported directly to Kresl.

According to Kresl, Chapman was ranked the lowest because her 2003 performance appraisal was the lowest of all the candidates and Chapman demonstrated a continued inability to shed her administrative and clerical duties. At deposition, Kresl explained that she wanted to retain employees who "could very quickly change their work routines, change their processes to be the most efficient that they can be" and that Chapman "would not be able to adapt to a time when there were more challenging workloads." Kresl Dep. 102, Pl. App. 180. Kresl ultimately decided that Chapman would be laid off in the RIF.

Afterwards, Holter made efforts to provide Chapman with other employment options. First, he suggested transferring Chapman within TDMN. However, Kresl refused because TDMN policy did not permit transfers during the RIF. Second, on October 28, 2004, Holter recommended Chapman to an editor at the St. Petersberg Times. Holter wrote: "Our books editor Cheryl Chapman, was one of the people laid off. She's an excellent copy editor. Was in over her head a little bit as books editor, but is really good at the detail stuff. Want me to send her your way?" Pl. App. 310.

On October 29, 2004, Chapman was laid-off along with about 100 other TDMN employees. She was 58-years old. Ealy assumed most of Chapman's duties as the new Assistant Editor-Books position. Notably, Chapman concedes that Ealy was "equally qualified" to her. Chapman Dep. 96, Defs. App. 45.

### 3.     *Freelance Opportunities*

A few days after her termination, Chapman advised Kresl of her interest in doing freelance work for TDMN. Chapman states "that [she] would now have time to do the writing and freelance work that I had always hoped to do and [she] would like to ... ." Chapman Dep. 99, Defs. App. 48. She also discussed freelance opportunities with Cathy Barber, the TDMN Food Editor. Barber suggested Chapman be considered for a front-page story in December about holiday cooking, but Barber did not return Chapman's subsequent four phone calls. TDMN did later run a holiday cooking story in December 2004. However, there is no record evidence on Kresl or Barber's decision-making process or the age or gender of the author of the December 2004 holiday cooking article. Chapman Dep. 102-03, 107, Defs. App. 51-52, 56.

4.      *Copy Editor Positions*

From January 2005 to July 2005,  TDMN had three open positions at the Features Desk: (1) an entry level Copy Editor I; (2) Copy Editor II; and (3) Copy Editor III.  Reed and Kresl were charged with interviewing and hiring the candidates.  Pagination, the electronic arrangement of text, artwork and advertising on the newspaper page, was an important qualification for the copy editor positions, and experience with CCI pagination, the system used at TDMN, was preferred.  Chapman did have experience in pagination as a copy editor but did not have CCI pagination experience.

On January 14, 2005, TDMN posted a job opening for the Features Copy Desk.

The ideal candidate should have daily newspaper experience, first-rate editing skills, an appreciation in language, nuance and style and an ability to work in a collaborative environment under deadline pressure.

Design and layout skills are a must.  The Morning News paginates in CCI, so knowledge of CCI Layout Champ is preferred, but not mandatory.

\* \* \*

Anyone interested in applying for this position should contact Lois Reed ... .

Defs. App. 095.

On March 1, 2005, TDMN apparently broadcast the same e-mail announcement. Pl. App. 312.  Sometime that month, Chapman called Reed expressing interest in the editor position.  On March 23, 2005, Chapman also sent Reed an e-mail expressing her interest in the Features Copy Desk opening.  Chapman wrote "I'd sure like to apply for this if it's still available," Reed advised her to forward her resume and Chapman attached her resume to her reply.  Defs. App. 78-79.  Two months later, on May 13, 2005, Chapman e-mailed Reed again advising her that she "would like to apply for one of the two positions open on the

Features copy desk." Defs. App. 168. At that time, the two positions open were the Copy Editor I and III slots. Kresl Dep. 133, Pl. App. 199. Chapman copied Sue Smith, her former supervisor, and Kresl on the May 13th e-mail. Reed considered Chapman for the Copy III Editor position. Reed Aff. ¶ 5, Defs. App. 177. Chapman and Charles Brown, who was also laid off during the RIF, were two of the three finalists for the Copy Editor III position. Kresl Dep. 135, Pl. App. 201. Kresl and Reed discussed Chapman's candidacy as Copy Editor III, but Kresl expressed concern over Chapman's prior "unsatisfactory" work. Reed Dep. 50, Defs. App. 156. Kresl added that Chapman had "had a hard time with the [Books Editor] workload and making decisions about workload and spending the best use of her time." Kresl. Dep. 132, Pl. App. 197. Kresl recommended Brown for the Copy Editor III position because she believed he was "an excellent designer and paginator on CCI." Kresl Dep. 136, Pl. App. 202. Reed ultimately chose Brown, her leading candidate, because he had extensive experience as a paginator, had won awards at TDMN and was an expert at layout and design. Reed Dep. 46, Defs. App. 154. Brown was over the age of 40 at the time of the hire.

Reed also made the following selections for the other open positions. In July 2005, Leslie Chu Van Wassenhove (Chu), a female under 40 and recent *magna cum laude* graduate from Harvard University, was hired for the entry level Copy Editor I slot. Reed did not consider Chapman for the entry level slot or only considered Chapman "briefly" because Chapman was overqualified and the pay was "vastly less." Reed Dep. 65, 78, Defs. App. 157, 159. Reed also hired Misty Bailey Davis, a female who had previously worked at TDMN in the same position and had CCI pagination experience, as the Copy Editor II.

Reed informed Chapman of her decision but encouraged her to apply elsewhere

within TDMN.  Chapman Dep. 108, Pl. App. 60.  Chapman, however, did not apply for any other positions at TDMN.  *Id.* at 109, Pl. App. 61.

**B.      Procedural Background**

On or about July 29, 2005, Chapman filed her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  Pl. App. 270.  On or about September 6, 2006, she received her EEOC right to sue letter.  On December 1, 2006, having exhausted her administrative remedies, Chapman filed her complaint against TDMN, Belo and BMS (doc. 1).[2]  Specifically, Chapman raises an age discrimination claim under the ADEA, 29 U.S.C. § 623(a)  and a gender discrimination claim under Title VII of the Civil Rights Act of 1964, as amended, against TDMN, Belo and BMS.

The crux of her age and gender claims can be broken into two separate parts.  Compl. ¶¶ 19, 26.  First, Chapman alleges that Defendants unlawfully discriminated against her because of her age and gender when they laid her off during the 2003 RIF and kept younger, less qualified male employees in October 2004.  Second, Chapman alleges that Defendants failed to hire her for the various open positions with TDMN in December 2004 and July 2005 in violation of Title VII and the ADEA.

On December 21, 2007, Defendants filed their motion for summary judgment (doc. 29).  The motion is now ripe for consideration.

---

[2] The record evidence demonstrates that BMS is responsible for the administrative task of paying TDMN employees.  BMS has never had more than 15 or more employees and has never had authority to hire, fire or supervise Chapman.  Daume Aff. ¶ 3, Defs. App. 178.  Likewise, Belo was not involved in any employment decision concerning Chapman.  Chapman has never been an employee of either Belo or BMS.  *Id.* at ¶ 4, Defs. App. 179.

## II. ANALYSIS

### A. Summary Judgment Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant is entitled to judgment. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). In a motion for summary judgment, the burden is on the movant to prove that no genuine issue of material fact exists. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 371-72 (5th Cir. 2002).

Chapman's action is grounded on alleged violations of Title VII and the ADEA. Title VII prohibits an employer from failing or refusing to hire or discharge an individual "because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA proscribes similar treatment based on age. 29 U.S.C. § 623(a)(1). The Court will now address the arguments of the parties.

### B. Belo Defendants

As a threshold issue, the Court grants Defendants' summary judgment as to Belo and BMS because these two entities are not "employers" under Title VII or the ADEA. An employer must fit within the statutory definition of "employer" and an employment relationship between Chapman and either Belo entity must exist. *Muhammad v. Dallas*

*County Cmty. Supervision & Corrections Dep't*, 479 F.3d 377, 380 (5th Cir. 2007); *Maxwell v. Knight*, 974 F. Supp. 899, 903 n.3. (E.D. Tex. 1996). BMS has never had fifteen or more employees. *See* 42 U.S.C. § 2000e(b) ("employer" must be fifteen or more employees); ADEA 29 U.S.C. § 630(b) ("employer" must have twenty or more employees); *Coleman v. New Orleans and Baton Rouge S.S. Pilots' Ass'n*, 437 F.3d 471, 479-80 (5th Cir. 2006) (evaluating whether defendant had ADEA-required 20 employees). Second, there is no competent summary judgment evidence to lead a reasonable trier of fact to conclude that an employment relationship existed between Chapman and either Belo entity. Chapman's self-serving affidavit and misplaced reliance on an employee handbook are not proper summary judgment evidence, and Chapman's assertion that Defendants are "interconnected and their business is intertwined" is unsupported. TDMN, principally through Kresl, had the requisite control and authority over Chapman's employment. Accordingly, Belo and BMS are entitled to judgment as a matter of law.

### C.    McDonnell Douglas Framework

In viewing the evidence most favorable to Chapman, the Court notes that there is no direct evidence of age or gender discrimination. Therefore, the Court looks to the *McDonnell Douglas* indirect, inferential framework to address both age and gender discrimination claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999) (applying *McDonnell Douglas* framework to both Title VII and ADEA claims). Under the three-step framework, the first two steps are satisfied by a production of evidence. *Baker v. American Airlines*, 430

F.3d 750, 753 (5th Cir. 2005) ("one need not persuade to shift the burden to the other party"). However, "[a]t all times, the burden of persuasion falls on the plaintiff." *Id.* at 754; *Davis v. Chevron U.S.A.*, 14 F.3d 1082, 1087 (5th Cir. 1994) ("At the end of the day, ... the plaintiff has the burden of proving a violation of Title VII occurred.") *citing St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742 (1993).

The plaintiff must first establish a *prima facie* case by proffering circumstantial evidence of discrimination. *Bauer,* 169 F.3d at 966 (noting first three elements of *prima facie* case for both Title VII and ADEA claims identical and the fourth element is tailored to the statute). The *prima facie* burden of production is not onerous. *Baker*, 430 F.3d at 754 (observing plaintiff need only make "low showing"). For RIF claims, the *prima facie* is established when the plaintiff shows that she was: (I) discharged; (ii) qualified for the remaining position; (iii) within the protected class at the time of the discharge; and (iv) either replaced by someone younger or outside the protected class or otherwise discharged because of age. *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 992-93 (5th Cir. 1996).[3] Similarly, for failure to hire claims, the *prima facie* requires that the plaintiff show that she: (I) was within the protected group; (ii) applied for the position; (iii) was qualified for the position when she applied; (iv) was not selected; and (v) after the non-selection, the position remained opened or was filled by someone outside the protected class. Once the plaintiff makes her *prima facie* case, she has established a presumption of discrimination.

---

[3] In *Reeves v. Sanderson Plumbing Products*, the U.S. Supreme Court abrogated circuit opinions, including *Rhodes*, that required, as a matter of law, independent evidence of discrimination beyond the *prima facie* and pretext evidence to sustain a jury's liability verdict. 530 U.S. 133, 141, 120 S. Ct. 2097, 2105 (2000).

*Bauer*, 169 F.3d at 966. The burden then shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for its actions. *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 881 (5th Cir. 2003).

Once the defendant meets its burden, the plaintiff then must offer sufficient evidence to create a genuine issue of material fact that the proffered legitimate, non-discriminatory reason is either not true (pretext) or, while true, is only one of the reasons and another motivating factor is the plaintiff's protected characteristic (mixed motive).[4] *Rachid v. Jack in the Box, Inc.* 376 F.3d 305, 312 (5th Cir. 2004). To prove pretext, the plaintiff must prove that either (1) a discriminatory reason more likely motivated the employer, or (2) indirectly by showing the legitimate, non-discriminatory reason is unworthy of credence. *Hall v. Gillman, Inc.*, 81 F.3d 35, 36 (5th Cir. 1996). If the plaintiff successfully pursues the mixed motive theory, the defendant then bears the burden to demonstrate that the same adverse employment decision would have been made irrespective of the unlawful motive. *Rachid*, 376 F.3d at 312.

In the case at bar, the Court notes that Chapman pursues only a pretext theory and places a heavy emphasis on *Reeves, Desert Palace* and *Rachid*. Pl. Resp. 24-25. In

---

[4]The third prong of the *McDonnell Douglas* test was altered in *Desert Palace, Inc. v. Costa,* 539 U.S. 90 (2003)(holding that the mixed-motive theory of discrimination is available in cases with circumstantial evidence of discrimination); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). In *Rachid*, the Fifth Circuit did not provide further instruction as to exactly how the evidence should be analyzed in each case. However, an examination of *Rachid* shows that the Fifth Circuit did not break its discussion of the plaintiff's evidence into categories of pretext and motivating factor, but instead considered all the evidence as a whole. *See id.* at 313-316. This is in line with Supreme Court precedent that holds that the key in a Title VII case is whether the employee's protected status "actually motivated" the employer's decision. *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 141 (2000). This Court, then, will consider Chapman's evidence as a whole to determine whether a fact issue exists.

effect, Chapman argues that her action survives summary judgment based on her evidence of *prima facie* case and pretext. The Supreme Court, in *Reeves,* found that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit a trier of fact to conclude that the employer unlawfully discriminated." 530 U.S. at 147-48. Thus, the Court agrees that Chapman *could* survive on such evidence, if Chapman *did* submit such competent pretext evidence. The Court, however, finds that, throughout all the record evidence, Chapman does not and concludes Defendants are entitled to judgment as a matter of law.

### D.      Reduction In Force

*1.      Prima Facie*

The Court first turns to Chapman's *prima facie* case for her RIF-related claim. To recap, Chapman must show that she was: (i) discharged; (ii) qualified for the remaining position; (iii) within the protected class at the time of the discharge; and (iv) either replaced by someone younger or outside the protected class or otherwise discharged because of age. *Rhodes,* 75 F.3d at 992-93. Defendants challenge whether Chapman was "qualified" for the consolidated position. While Defendants' arguments are persuasive, the Court finds that Chapman's case falters convincingly at the pretext stage. Thus, the Court will assume *arguendo* that Plaintiff meets her *prima facie* burden and that there is a presumption of discrimination. *See Okoye v. Univ. of Texas Houston Health Sci. Ctr.,* 245 F.3d 507, 513 (5th Cir. 2001) (assuming *prima facie* case because case decided on pretext issue).

*2.      Legitimate, Non-Discriminatory Reason*

Defendants must therefore articulate a legitimate, non-discriminatory reasons for laying off Chapman during the RIF.  Here, Defendants point to the economically-driven RIF in 2004 and Chapman's 2003 performance reviews, and the evidence in support, as their legitimate, non-discriminatory reason.  An employer's decision to eliminate a job position, such as Chapman's, has been recognized as a legitimate, non-discriminatory reason for terminating an employee.  *E.E.O.C. v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996) (noting an RIF "is itself a legitimate, nondiscriminatory reason for discharge"); *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 150 (5th Cir. 1995) ("Job elimination or office consolidation is a sufficient non-discriminatory reason for discharge under the ADEA").  Further, basing a layoff decision on performance is also considered a legitimate reason for termination.  *See, e.g., Tex. Instruments*, 100 F.3d at 1181.  The Court finds that Defendants have likewise satisfied their burden of production.  Any presumption of discrimination has disappeared.

3.    *Pretext*

The Court must therefore determine whether Chapman has produced competent summary judgment evidence showing that a reasonable trier of fact could find that TDMN's stated reason for her discharge was a pretext for either age or gender discrimination.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).  As applied, Chapman must show that the RIF and Chapman's 2003 review were not the true reason she was selected for the RIF.  *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)

At first blush, the material facts not in dispute demonstrate little, if any,

discriminatory animus. As mentioned *supra*, economically driven RIF's are legitimate, non-discriminatory reasons. As a consequence, courts, which are ill-suited to make personnel decisions, are loathe to substitute their views for that of individuals with the requisite training and experience who are charged with those decisions. *Deines v. Tex. Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280 (5th Cir. 1999).

Therefore, in order to show pretext, Chapman must produce evidence creating a fact issue as to whether she was "clearly better qualified" than Ealy. To do so, she must produce evidence suggesting that the disparities in qualifications between herself and Ealy were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen Ealy over Chapman. *Manning*, 332 F.3d at 882 n.4 (holding the "clearly better qualified" standard applies post-*Reeves*); *Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002)(holding the losing candidate's qualifications must "leap from the record and cry out to all who would listen that [s]he was vastly--or even clearly--more qualified...")*; Deines*, 164 F.3d at 280-81.

Here, the record evidence is consistent. No reasonable trier of fact would find that Chapman was "clearly better qualified" than Ealy. Chapman concedes that Ealy is "equally qualified" to her. She even admits the veracity of Defendants' articulated legitimate, non-discriminatory reasons:

(1)     the TDMN RIF was due to lower revenues, higher expenses and political ads falling short; Chapman Dep. 259-60; Defs. App. 85-86,

(2)     her 2003 self-appraisal highly critical of her performance was "truthful and honest"; Chapman Dep. 76, Pl. App. 39,

(3)     she lacked good business judgment and time management; Chapman Dep. 57-58, Pl. App. 30, Defs. App. 22,

(4)     she admits did not follow Kresl's suggestions to reduce her administrative

(5)     and clerical duties; Chapman Dep. 78-79, 81, Defs. App. 34-35, 37, and she has no reason to believe Kresl discriminated against her because of her age or gender other than the fact that she was laid-off; Chapman Dep. 44-45, Defs. App. 60-61.

Her testimony is consistent with the record evidence.  Kresl's 2003 performance review is equally critical of her job performance, and no reasonable trier of fact would quibble with Kresl's opinion that Chapman "would not be able to adapt to a time when there were more challenging workloads" associated with the consolidated position. Indeed, prior to any talk of an RIF, Chapman believed that Kresl's proposed performance improvement plan might very well be "the initial step" to terminate her if she did not improve her job performance.  No reasonable trier of fact would detect any unlawful animus during the RIF.

In just three short paragraphs, however, Chapman asks this Court to conclude that there is a material issue of fact on pretext.  First, Chapman claims that because the 2003 evaluation was  "completely subjective," the jury must be able to access the credibility of Defendants.  Pl. Resp. 27.  Second, Chapman points to the retention of younger, male employees during the RIF as pretext.  Third, Chapman relies on the "other charges of discrimination" can be "evidence of discriminatory animus."  Pl. Resp. 27.  The Court finds, however, that no reasonable finder of fact could find pretext based on Chapman's pretext evidence.

As an initial matter, Chapman's effort to paint the 2003 performance review as

"completely subjective" is without support.[5] Chapman's reliance on *Medina v. Ramsey Steel Company* is likewise misplaced. 238 F.3d 674 (5th Cir. 2001). In *Medina*, the selection criteria was entirely subjective. *Id.* at 678-81 (*Medina* plaintiff told that he did not have the "right 'ingredients' for the job" and failed to meet the "substantial sales experience" requirement). Chapman's 2003 evaluation, on the other hand, was far more objective and detailed. More importantly, the *Medina* rejected the employer's effort to use that subjective criteria to thwart the plaintiff's *prima facie* "qualified" element. 238 F.3d at 681 ("a *prima facie* case is established once the plaintiff demonstrates that objective employment qualifications have been met"). Contrary to Chapman's suggestion, *Medina* does not support her position that TDMN's purported subjective criteria is evidence of pretext. Chapman still needs to demonstrate a material fact issue remains at the pretext stage. *See, e.g., id.* at 683 (plaintiff pointing to considerable 18 years of detailing experience over the 22-year old hire and "get rid of all the old people" comment as pretext evidence).

Second, Chapman's evidence of the age or gender of TDMN employees retained is relevant to her *prima facie* case, not to pretext. Nevertheless, the Court notes that the record evidence showing employees over 40 or female that were *not* adversely affected by the RIF. *See Tex. Instruments,* 100 F.3d at 1181 (emphasizing fact that candidate retained was 51-years old and plaintiff was 55-years old). In the "big picture," Chapman's evidence

---

[5]Even a cursory inspection of the 2003 evaluation itself shows objective, standardized criteria that Kresl followed. Chapman likewise cites to dubious support in the deposition testimony of Kresl. A plain reading of Kresl's deposition testimony indicates that Kresl testified about formal evaluation forms, Belo values from HR that serve as guidelines, and rating scale detailed on the first page of the evaluation form.

appears to even undermine her claims.  *See Skinner v. Brown*, 951 F. Supp. 1307 1320

(S.D. Tex. 1996) (finding plaintiff's evidence did not contradict defendant's legitimate,

non-discriminatory reason).  It would behoove Chapman to have accounted for the fact

that some of the purported comparators are in a protected class and were retained during

the RIF.  *Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d 989, 1000 (E.D.N.Y.

1999) ("Defendant's continued employment of a significant number of individuals who

are roughly the same age as plaintiff and who belong to the same racial and religious

groups as plaintiffs undercuts any inference that plaintiff's termination was

discriminatory.").  Snyder and Tracy Brown are female.   Maza and Ealy are both over the

age of 40.  Additionally, Kresl, the ultimate decision-maker,[6] herself is a female over the

age of 40 and thus within the same protected class as Chapman.  *See Skinner*, 951 F. Supp.

at 1320 (pointing out that both supervisors within ADEA protected class).

Her other "evidence" is of little relevance.  Her comparator evidence involves

other employees who are *not* similarly situated to Chapman.  *See Okoye*, 245 F.3d at 514

(observing plaintiff nurse who assaulted co-worker was not discharged under "nearly

identical" as physicians); *Little v. Republic Refining Co. Ltd.*, 924 F.2d 93, 97 (5th Cir.

---

[6] As Defendants point out, to the extent Chapman implicitly argues that Kresl was Holter's "cat's paw," the Court finds that claim without support.  *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 226-27 (5th Cir. 2000) (plaintiff must demonstrate manager's animus and manager's influence over "titular decision maker"); *see generally Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1231 (10th Cir. 2000) (explaining "cat's paw" or rubber stamp analysis of supervisors).  Here, Chapman testified that Holter treated her "fairly and properly" in the "professional context."  Chapman Dep. 94, Defs. App. 43. Chapman presents no evidence to contradict Kresl's testimony that she was the ultimate decision-maker for the RIF.  Indeed, the evidence that Holter suggested transferring Chapman within TDMN during the RIF and *sua sponte* recommended her to another newspaper undercuts any notion that Holter even held any unlawful discriminatory animus towards Chapman.

1991) (rejecting plaintiff's proffered comparator when plaintiff and comparator had different supervisors).  Chapman cannot cherry-pick statements within other TDMN employee personnel files out of context to create a material issue of fact.  Similarly, neither a separate legal action against TDMN,[7] inadmissible hearsay[8] nor a self-serving affidavit are competent evidence to defeat Defendants' motion for summary judgment. *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir. 1994) (rejecting unsubstantiated assertions as competent summary judgment evidence); *Grizzle v. Traveler's Health Network*, 14 F.3d 261, 268 (5th Cir. 1994) (finding plaintiff's self-serving generalized testimony insufficient); *see generally Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5rh Cir. 1992) (noting nonmovant's evidentiary burden could be satisfied with depositions, affidavits and other competent evidence).

Stripped of Chapman's proffered pretext evidence, Chapman is left with only her

---

[7] Chapman's reliance on a separate legal action against TDMN demonstrates her fundamental misunderstanding of *Vance* and *Shattuck*.  Pl. Resp. 28.  *Vance v. Union Planters Corp.* involved a prior adverse verdict of pay discrimination against women admitted at trial.  209 F.3d 438, 444-45 (5th Cir. 2000).  The *Vance* court found no Rule 404(b) error and noted that the employer failed to show any resulting prejudice from the admission.  In *Shattuck v. Kinetic Concepts, Inc.,* the court of appeals noted that *evidence* of discrimination against other members of the plaintiff's protected class may be "highly probative."  49 F.3d 1106, 1009-10 (5th Cir. 1995).  Thus, the testimony of a human resources manager of other protected members was properly admitted at trial.  *Id.* at 1110.  The allegations from another lawsuit that Chapman clings to have no probative value.  *Topalian*, 954 F.2d at 1131 ("Mere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment.").  Juxtaposed against the evidence considered at trial in *Vance* and *Shattuck*, Chapman's misapplication of *Vance* and *Shattuck* is apparent.

[8] Her reliance on inadmissible hearsay sprinkled throughout her Response is rejected as competent evidence.  For example, Jerome Weeks, who worked for Chapman in Books, could not recall the speaker or context of the "Grecian formula" comment.  Pl. Resp. at 15.  Chapman also concedes that Holter's comment about TDMN's focus on a younger demographic of readers, not TDMN employees.  Chapman Dep. 109-10, Pl. App. 61-62.

*prima facie* evidence that Ealy, her replacement, is a "younger" 50-year old male. However, to create a material fact, Chapman must show that she is "clearly better qualified" than Ealy. Based on her deposition testimony that Ealy is "equally qualified" almost foreordains this inquiry.

Nevertheless, delving into the objective record evidence, the Court finds that no reasonable trier of fact would find that Chapman is "clearly better qualified" than Ealy. Chapman's own experience, coupled with her degrees in English and Fine Arts, is not of the nature that far surpasses Ealy's masters degree and work towards his Ph. D. along with his work experience. *See Deines,* 164 F.3d at 280 ("unless disparities in curricula vitae are so apparent as virtually to jump off the page and slap us in the face, we judges should be reluctant to substitute our views for those of the individuals charged"). The Court therefore cannot conclude that no reasonable trier of fact would find such disparities in qualifications exist between Chapman and Ealy such that Chapman was "clearly more qualified" than Ealy.

In sum, Chapman fails in her ultimate burden of persuasion. Under *Reeves* and its progeny, a *prima facie* case standing alone, like Chapman's, is insufficient to carry her burden.

### D.    Failure to Hire

Turning to Chapman's other claim that Defendants unlawfully discriminated against her because of her age and gender, Chapman claims Defendants were in violation of the ADEA and Title VII when TDMN did not hire her for various open positions. Those positions at issue can be broken into two categories: (1) freelance work; and (2)

copy editor positions at the Features Desk. Upon review of the record evidence, the Court finds no genuine issue of material fact exists. Defendants are entitled to judgment as a mater of law.

1.    *Prima Facie*

Here, the Court finds that Chapman has submitted questionable *prima facie* evidence for her failure to rehire claims. Thus, the Court will not simply assume *arguendo* that the *prima facie* burden is met despite the later dispositive nature at the pretext stage.

For the freelance work, Defendants raise valid challenges to Chapman's *prima facie* evidence. Specifically, the Court agrees with Defendants that Chapman fails to meet her low burden of proving that she properly "applied" for freelance work and that she was replaced by someone outside the protected class. The Court finds that no reasonable trier of fact would find that, based on Chapman's testimony that a few days after she was terminated she asked Kresl and Barber about freelance opportunities, constitutes an *prima facie* "application." Second, Chapman fails to adduce any evidence that a person outside of the protected class was hired for whatever freelance work she supposedly applied for. Chapman's contention that "Defendants claim that they cannot identify those who may have received freelance work instead of Chapman" and "Defendants could have identified the individual who wrote a front page story in December 2004 about holiday cooking and did not" turns the *prima facie* burden on its head. Pl. Resp. 29-30. For these reasons, Chapman's failure to hire for freelance work fails as a matter of law.

The Court likewise has some concern over Chapman's *prima facie* case for the copy editor slots. Chapman clearly belongs in two protected groups (over 40-years old and

female), that someone outside the protected class was hired (Brown and Chu) and that she was qualified. Chapman shows convincingly that she was qualified to be a copy editor. Chapman was a former copy editor at TDMN, done computerized lay-outs as a books editor and had pagination experience, albeit not with CCI pagination. Moreover, in recommending Chapman for a copy editor opening at the St. Petersberg Times, Holter labeled Chapman "an excellent copy editor" who was "really good a the detail stuff."

However, whether a reasonable trier of fact would find that she applied for all three copy editor positions is questionable. Chapman focuses on Copy Editor I Chu and Copy Editor III Brown. Pl. Resp. 20-22. However, Chapman argues that her summary judgment evidence demonstrates that she was "qualified for the position as Copy Editor I, II and III." Pl. Resp. 30. In her confidential brief, she alludes to the qualifications of Chu, Brown and Bailey. Pl. Confidential Br. 4-5. While it is not clear to the Court which positions Chapman contends she applied for, the Court will assume *arguendo* that Chapman applied for all three copy editor positions for the sake of completeness and that her *prima facie* burden has been satisfied. *See Okoye*, 245 F.3d at 513.

2.     *Legitimate, Non-Discriminatory Reason*

Defendants' proffered legitimate non-discriminatory reason, with competent evidence in support, was that the other candidates (Brown , Davis and Chu) had better pagination experience (*i.e.*, experience with the CCI system), and that Kresl still had concerns over Chapman's prior work performance issues. The Court again finds Defendants have met their burden.

3.     *Pretext*

Chapman pursues interesting avenues to prove that Defendants' reasons are false. None, however, are sufficient to carry her ultimate burden of persuasion. Notably, the Court finds Chapman once again ignores any credible attempt to evince that she was "clearly better qualified" than the candidates hired for the copy editor positions.

First, Chapman seeks to flip her ultimate burden of persuasion onto Defendants: "Defendants have failed to come up with any reasons other than vague allegations regarding Chapman's administrative abilities which are not related to the job in question" and Defendants have not submitted any evidence of the other candidates' qualifications. Pl. Resp. 29. Second, Chapman attempts again to create a dispute in material fact by claiming that Reed's decision to hire was based on entirely subjective criteria. Specifically, Chapman equates the employer's "not best qualified" decision in *Alvarado v. Texas Rangers*, 492 F.3d 605 (5th Cir. 2007), with TDMN's decision to not hire her for any of the copy editor positions. Pl. Resp. 28-32.

The Court rejects Chapman's approach for several reasons. At the outset, the Court finds Chapman oversimplifies Defendants' legitimate, non-discriminatory reason from a multi-faceted business decision (e.g., CCI pagination preference, Chapman's prior business judgment, Brown, Davis and Chu qualifications) into a strawman isolated reason that Chapman purports to easily discredit. The record evidence, however, contradicts Chapman's version.[9] Chapman also overreaches with *Alvarado*. Much like *Medina*,

---

[9] The Court is troubled by Chapman's representation of Reed's deposition testimony that the copy editor position did not involve any administrative duties. Contrary to this representation, the Reed deposition testimony shows that the copy editor slot did indeed involve administrative duties. Defendants' counsel expressly asked "[d]o you know what [Plaintiff's counsel] meant by clerical or

*Alvarado* stands for the unremarkable proposition that employers may not use entirely subjective criteria to defeat a plaintiff's *prima facie* case. *See* 492 F.3d at 615 (reversing district court's summary judgment opinion that plaintiff failed to show adverse employment decision). Even assuming that Reed and Kresl employed entirely subjective criteria to hire the copy editors, Chapman still does not meet her onus of producing pretext evidence.

Once again, it is Chapman's burden to prove that she is "clearly better qualified" than Brown, Davis or Chu. Chapman's re-presentation of her *prima facie* evidence that she was "qualified" does not pass muster. Pl. Resp. 30-31 (focusing on element that she was "qualified"); Pl. Confidential Br. 4 ("Documentation Shows That ... Positions Were Filled with Substantially Younger Employees Chas Brown, Leslie Chu and Misty Bailey"). In other words, Chapman argues that, because Chapman was qualified and Brown, Davis and Chu are outside one of the protected classes, a material fact must necessarily exist as to whether Defendants' reason is pretext. The Court disagrees. While Chapman makes a convincing case that she was "a very talented copy editor," Chapman must still show that she was "clearly better qualified" than Brown, Davis or Chu, an obstacle Chapman fails to overcome. *See Tex. Instruments*, 100 F.3d at 1184 ("The agency showed only that the supervisors were qualified, not that they were clearly better qualified than the supervisors

---

administrative functions?" Reed answered, "No." Reed Dep. 80, Defs. App. 161. Reed then testified that the copy desk editor duties would involve paperwork, reports and computer data work which were duties Reed recalls Chapman had previously had trouble with. *Id.* Chapman's selective citation to Reed's initial misunderstanding did not go unnoticed by the Court. *Compare* Pl. Resp. at 20-21 *with* Reed Dep. 80, Defs. App. 161 (clarifying that copy editor position would require paperwork, reports and computer work)

retained in the RIF.").

Getting down to the brass tacks, the Court finds that no reasonable trier of fact would find that Chapman was "clearly better qualified" than Brown, Davis or Chu. *Manning*, 332 F.3d at 882; *Price v. Fed. Ex. Corp.* 283 F.3d 715, 723 (5th Cir. 2002) (rejecting plaintiff's better education and experience and longer tenure with company as evidence establishing "clearly better qualified" over candidate selected for promotion). Brown had the essential experience in CCI pagination and was an expert in layout and design. Davis held the same exact position she was re-hired for. Chu was a *magna cum laude* graduation of Harvard University and was qualified for the entry level slot with some recent pagination experience. At its core, Chapman's argument asks this Court to allow a jury just second-guess Defendants' principled, non-discriminatory business decision to hire candidates other than Chapman. *See* Pl. Confidential Resp 5 (complaining that Chu and Davis "had anywhere near the experience that [Chapman] had as a copy editor" and Pl. Resp. 30 (Chapman's "copy editing talents were well-known at the paper.").[10]

In sum, Chapman's failure to hire claims (as well as her RIF claim) fall short in this summary judgment context because she has failed to proffer competent summary

---

[10] Nor will the Court equate Chapman's apparent overqualification for the Copy Editor I slot with being "clearly better qualified." Reed testified that Chapman was "not suited" because she was overqualified and "beyond that in her level of experience." Reed Dep. 65, Pl. App. 230. An employer's opinion that an applicant is overqualified is a legitimate, non-discriminatory business reason, particularly in the absence of other discriminatory evidence. *Timmerman v. IAS Claims Svcs. Inc.*, No. 96-cv-0016, 1997 WL 279783, at *4 (N.D. Tex. May 19, 1997) (emphasizing lack of other discriminatory evidence and plaintiff's view that job was too easy).

judgment evidence - as she must - to allow a reasonable trier of fact conclude that

Defendants' legitimate, non-discriminatory reasons were false.  Ultimately, Chapman's

action begins and ends with her *prima facie* evidence.  Finding no material fact at issue,

the Court finds Defendants are entitled to judgment as a matter of law.

## III.  CONCLUSION

For the foregoing reasons the Court GRANTS Defendants' motion for summary

judgment in entirety.

**SO ORDERED.**

**SO ORDERED.**
**MAY 27th , 2008.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE